# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 17, 2014 Session

## STATE OF TENNESSEE v DEVONTA AMAR CUNNINGHAM

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-2006     Monte Watkins, Judge**

---

**No. M2012-02203-CCA-R3-CD - Filed January 14, 2015**

---

A Davidson County Criminal Court Jury convicted the appellant, Devonta Amar Cunningham, of first degree felony murder and especially aggravated robbery, a Class A felony. After a sentencing hearing, the appellant received an effective life sentence. Subsequently, he filed a petition for a writ of error coram nobis. On the same day, he filed a motion for new trial and for judgment of acquittal. The petition and the motion were denied by the trial court. On appeal, the appellant contends that the evidence is insufficient to support his murder conviction and that the trial court erred by refusing to compel a witness to testify after the witness asserted his Fifth Amendment right against self-incrimination; by refusing to admit a co-defendant's prior statement as substantive evidence; by limiting his cross-examination of a State's witness; by allowing evidence to be admitted in violation of the rules of discovery; and by denying his petition for a writ of error coram nobis. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROGER A. PAGE, J., and J. ROBERT CARTER, JR., SP. J., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Devonta Amar Cunningham.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Deborah Housel and Leticia Alexander, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In June 2008, the Davidson County Grand Jury indicted the appellant, and his co-defendants Ashton Gains, Mychal Hendricks, Lance Featherston, William Davis, and Deandra Smith on charges of first degree felony murder and especially aggravated robbery. The charges resulted from the robbery and shooting of Corey Wayne Sanders on September 30, 2007. The appellant was tried separately from his co-defendants.

At trial, Lisa Lynn White testified that in September 2007, she lived at 2912 Highland Drive with her four children, including the twenty-one-year-old victim, and the victim's fiancé, Jessica Haines. On the night of the victim's death, White was taking care of her grandmother "three doors up." She said that she went to bed about 12:30 or 1:00 a.m., that she "received a call," and that her grandmother woke her "with a scream that Corey had been hurt really bad and I needed to get down there." White ran down the street to her home and saw Haines holding the victim, who was lying behind the fence around White's yard, a few feet from the street. Haines told White that the victim had been shot. White walked closer to the victim and saw that his skin was gray and that he had been shot in the torso. White's fiancé, John Beasley, called 911 and rubbed the victim's legs in an attempt to maintain circulation. White put a towel over the victim, and several neighbors came outside, one of whom performed cardiopulmonary resuscitation (CPR). Shortly thereafter, an ambulance arrived and transported the victim to the hospital. The victim died shortly after arrival.

White testified that earlier that day or the day before, the victim had been in a wreck while riding motorcycles with Beasley. Afterward, the victim sold the wrecked motorcycle for $3,200. He planned to save the money to buy another motorcycle.

Jessica Haines, the victim's fiancé, testified that she met the appellant, whom she called "Papa," through the victim. On September 28, 2007, Haines and the victim were in White's backyard when the appellant and another man drove up. The two men walked into the backyard and asked to see a new litter of puppies owned by the victim. While the men were there, the victim's cousin, Casey, came over and asked to buy the victim's wrecked motorcycle. The victim agreed, and Casey paid him with ten one-hundred-dollar bills. Casey asked the victim for riding gear, and the victim sold it to him for $500. The appellant was in the backyard with the victim and Casey when the transactions took place.

Haines testified that in the early morning hours of September 30, the victim's telephone rang, and he asked her to answer it. A man, who identified himself as "Papa's friend," said, "I need three of them." Haines did not know what the man meant and told him that the victim was asleep. Less than one minute later, the victim's telephone rang again. Haines answered it and recognized the appellant's voice. He told her, "Hey, man, them are my boys. Where is Corey at?" The victim took the telephone, and Haines heard him say,

"I'll be outside in just a few minutes. Y'all can come on."

Haines testified that the victim put on blue jean shorts over a pair of gym shorts and went outside. A few seconds later, Haines heard five gunshots and ran to the window. She saw an African-American man run out of the yard and toward a dark-colored car, possibly a two-door Ford Thunderbird, that was parked in front of White's mailbox. The car appeared to be the same car that was there when the appellant came to look at the puppies. Haines saw two men outside of the car. One, a tall, thin, African-American man, was standing by the driver's side and got into the driver's seat. The second man, who was African-American and bald, ran out of the yard and got into the front passenger seat. A third man, who was African-American with dreadlocks, was in the back seat.

Haines testified that the car drove away at a high rate of speed and that she went outside. She could not see the victim, so she screamed his name. She heard him moan and turned to see him lying face-down in the yard. She saw blood on his shirt, and his face was pale. A next-door neighbor came outside to help, and Haines left the victim to telephone White. As Haines attempted to perform CPR, White arrived. A police car and an ambulance arrived a few minutes later. Haines said that a few hours after the shooting, the police showed her a photograph array from which she identified the appellant as "Papa."

Haines testified that when the victim went outside, his cellular telephone and the money from the sale of the motorcycle were in his pocket. After the shooting, nothing was in his pockets. The State showed Haines a Cricket-brand cellular telephone, and she identified it as the victim's telephone. She said that she was with the victim when he purchased the phone two months before his death and that he kept the box in which the phone was packaged.

On cross-examination, Haines testified that she may have told the police that the appellant sometimes bought marijuana from the victim three or four times a week. However, she did not recall saying it. Nevertheless, she acknowledged that the victim sold marijuana and that his customers typically paid with cash. She further acknowledged that it was not unusual for the victim to carry large sums of cash. Haines said that the victim allowed the men who ultimately shot him to come over after the appellant vouched for them. She did not see the appellant at the house that night. Haines knew the victim sometimes carried a gun, but she did not know of any "bad blood" between the victim and the appellant.

Metro Nashville Police (Metro) Detective Jack Stanley testified that in the early morning hours of September 30, 2007, he was dispatched to 2912 Highland Drive to investigate a shooting and was the first officer to arrive. Several family members and neighbors were in the yard, and two of them were performing CPR on the victim. Other

officers and an ambulance arrived within a couple of minutes. The ambulance transported the victim to the hospital.

Detective Stanley testified that he roped off the area with crime scene tape. He spoke with two or three neighbors, who told him that they heard four or five gunshots before seeing a blue or black Thunderbird speed away. Detective Stanley broadcast a description of the car and instructed his fellow officers to be on the lookout for it. He searched the scene for shell casings but did not find any.

Metro Detective Warren Fleak testified that in September 2007, he was a crime scene officer. He investigated the scene of the shooting but found no shell casings. Detective Fleak found the victim's shirt, which had been removed by emergency medical services (EMS), in White's yard. He saw several small bullet holes in the shirt. He also noticed powder residue around the holes, indicating that the shots were fired within five feet of the victim. A bullet fell to the ground when he picked up the shirt, and he collected the bullet.

Detective Fleak testified that during the investigation, a 1987 Ford Thunderbird was searched, checked for fingerprints, and underwent other forensic testing. Detective Fleak found a pay stub bearing the name of "Michael F. Smith" inside the car.

Yolanda Coleman testified that on September 30, 2007, she was living at 2911 Highland Drive, which was located directly across the street from White's residence. In the early morning hours, Coleman was in her driveway talking on a telephone when she saw a dark-colored car stop in front of the fence surrounding White's yard. Four or five African-American men were in the car, and two or three of them got out and walked to the fence. The victim came out of White's house and stood inside the fence. Coleman heard three to six gunshots, saw the African-American men run to the car, and saw the car drive away.

Co-defendant Ashton Gains testified that he knew the appellant as "Papa." Early on the night of September 29, 2007, Gains and the appellant went to a house party in Mt. Juliet. Gains's cousin, Lance Featherston; Mychal Hendricks; Deandra Smith; and two men Gains knew as "Hootie" and "Hammer" also went to the party. About 8:30 p.m., all of them left the party and went to a McDonald's restaurant. Gains drove his green Ford Thunderbird, and the appellant, Hammer, and William Davis, also known as "Flame," rode with him. Deandra[1] drove his gray Chevrolet Caprice and was accompanied by Lance, Hendricks, and Hootie. A gun was under the back seat of Gains's car, and another gun was in Deandra's car.

Gains testified that the group stayed at McDonald's for one and one-half hours and

---

[1]Because some of the witnesses share a surname, we will refer to them by their first names for clarity.

drove back to Nashville, dropping off Hootie and Hammer along the way. The appellant, Gains, Lance, Hendricks, Deandra, and Davis gathered at Lance's house. Gains, Hendricks, Davis, and Lance went into the back bedroom to talk and watch television while everyone else "stayed around in the yard." The men wanted to smoke some marijuana and go to Club Faded, so Gains asked the appellant if he knew of anyone who sold marijuana. The appellant replied that he might. Gains, who was accompanied by Lance and Davis, followed Deandra, who was accompanied by the appellant, toward the club. En route, the appellant telephoned Gains and said that the victim might have some marijuana and that he would "just rig it up." They parked a few streets away from the victim's house, and Gains, Deandra, and the appellant exited the cars. The appellant took Gains's cellular telephone and gave it to Deandra, who dialed a number provided by the appellant. A few seconds later, the call ended, and Deandra told the men that the victim was not there. The appellant took the telephone from Deandra and dialed. Gains heard the appellant say, "Is Corey there? This is Papa. . . . I was trying to get some weed. . . . Did you have any?" Gains also heard the appellant ask if he could come to the victim's house and pick up the marijuana. Gains thought the victim's response was yes.

Gains testified that after the call, the appellant returned Gains's telephone. Gains walked to his car, followed by Deandra. Deandra asked Gains, Lance, and Davis for money to buy the marijuana, and they gave it to him. Deandra then walked over to the appellant, and Gains heard the appellant tell Deandra, "You can rob dude." Deandra did not respond and "just looked at" the appellant. Gains turned, told the men in his car what the appellant had said, and asked if they had heard it. The men said no. Gains took a "shoe bag" from his car and used it to cover his license plate. Deandra told Gains that he wanted Lance, the appellant, and Hendricks to go to the store and that they would all rendevous in the "Shelbywood" neighborhood.

Gains testified that Deandra got into Gains's car and that they followed the appellant, who was driving Deandra's Caprice. After a couple of streets, Gains turned onto the street where the victim lived, and the appellant kept driving straight. Gains redialed the number the appellant had called. Gains told the victim that they were almost there, and the victim responded that he was waiting outside. Gains parked in front of the victim's house and remained in the car with Davis while Deandra got out. Gains saw Yolanda Coleman, who was talking on the telephone, on the front porch of the house to the left of his car and saw the victim give Deandra a bag of marijuana. Deandra examined it and headed toward Gains's car. However, Gains told him, "Nah, we good," so Deandra went back to the fence and spoke with the victim for a few seconds. Deandra pulled some money from his back pocket and began counting it. He then pulled out a .357 caliber revolver. The victim put his hands up, and Deandra told the victim "to give him everything out of his pockets." Davis got out of the car to see what was happening. Deandra repeated his demand, and the victim put

his hands into his pockets and withdrew more bags of marijuana. The victim again put his hands up. A few seconds later, Deandra shot the victim three times, and the victim fell to the ground. Deandra and Davis ran back to the car, and Gains started the car. As Gains pulled away, Deandra fired two more shots out the window.

Gains testified that Deandra told him to slow down, turn on the headlights, and drive toward Shelbywood. Gains complied and parked in a carport beside a house. Gains exited the car, began pacing back and forth, and removed the bag from his license plate. Deandra walked to the corner of the house. He returned with a gun and a cellular telephone in his hand and tried to calm Gains. Gains, Davis, and Deandra left and met the appellant, Hendricks, and Lance behind Tom Joy Elementary School.

Gains testified that Deandra told the appellant, Hendricks, and Lance that "he robbed [the victim] and he had to shoot him." Deandra offered to share the money with Gains, but Gains refused and said he wanted to leave. Deandra gave Gains some marijuana and returned the money Gains had given him to pay the victim. Deandra also returned Lance's money and gave Lance some marijuana. As Gains left, the appellant asked for a ride home, and Gains agreed.

Gains testified that when he got home, Deandra called to ask if he was "all right," and Gains responded that he was. Deandra asked if Gains still wanted to go to the club, and Gains said yes. Deandra said that Gains should not drive, that he should leave his car parked in his backyard, and that Deandra would be by soon to pick up Gains. Deandra, Davis, Lance, the appellant, and Gains went to the club and met some females. Afterward, Deandra drove Gains home. Gains then drove to Davis's house. When the females they had met earlier arrived, Gains and Davis followed them to their home in Kentucky.

Gains testified that the next morning, he received a text from Lance, telling him that the shooting was on the television news. Gains and Davis returned to Nashville. A couple of days later, Gains encountered Deandra, who "told [Gains] the story that [Deandra] wanted [Gains] to tell the detectives, or the police, if they ever came questioning." The story included almost everything that had occurred that evening but omitted going to the victim's house. Deandra said that he had spoken with everyone else and that they had agreed to tell the police the same story.

Gains testified that a couple of days later, he returned home from college and found Detective Curtis Hafley's card on his front door. Gains called the detective, who came to Gains's home. Gains told Detective Hafley the story Deandra had concocted. Detective Hafley said that he did not believe Gains and that he wanted Gains to tell the truth. Gains denied knowing anything else, and Detective Hafley left. Later that night, the appellant

called Gains and asked, "Where was the gun that [Deandra] used to kill [the victim]?" Gains responded, "I don't know what you're talking about." Gains said that the appellant contacted him again after the call about Deandra's gun. During those conversations, the appellant told Gains "not to say anything" and that the State did not have "anything." Gains said that he knew Michael Smith from school, that Michael also drove a Ford Thunderbird, and that Michael was the appellant's friend.

Gains testified that one-half hour or one hour later, which was close to midnight, he heard Detective Hafley and other officers knock on his door, asking to come inside. Gains agreed. Upon questioning, Gains became "emotional," "broke down," and "let them know the truth of what had happened that day." Afterward, Gains was taken to the police department, interviewed again, and arrested.

On cross-examination, Gains testified that when the men stopped a few streets from the victim's house to talk about getting marijuana from the victim, Gains was parked behind Deandra's car. The driver's window of Gains's car was rolled down, and Gains was standing beside the driver's door. The appellant and Deandra were standing between the two cars. Gains did not hear their entire conversation, explaining that he was not paying attention the entire time. However, he heard the appellant say, "You can rob Dude." Gains did not think anyone else was paying attention to the conversation.

Gains testified that after he was transported to the police department, his conversation with the police lasted about thirty minutes. Detective Hafley asked, "Did Papa set this up? Is he the one in charge?" Gains responded, "I guess he must be." Gains acknowledged that he never heard the appellant tell Deandra to shoot the victim. He also acknowledged that the victim's name was never mentioned until he suggested that the men buy some marijuana. The appellant said he knew someone from whom they could make the purchase. Before the buy, Deandra collected money from the men to pay for the marijuana. Gains said that he hoped his testimony would help him obtain favorable treatment from the State. However, he said he would have testified anyway in order to relieve his conscience.

Co-defendant Lance Featherston testified that on the evening of September 29, 2007, he, the appellant, Deandra, Gains, Hendricks, and Davis went to a party in Mt. Juliet. Deandra had a .357 caliber gun. After the party, they went to a McDonald's restaurant. They left McDonald's and went to Lance's house, and Lance went inside and changed his clothes to go to a club. Lance's sister, Asica Featherston, was in the house, but she did not come out of her bedroom while the men were there. Lance went back outside, and the appellant asked if they wanted to rob the victim. Lance said the men "brushed it off" and told him, "We don't care." Lance and Gains gave the appellant money to purchase the marijuana.

-7-

Lance testified that the men left his house in two cars and drove toward the victim's house. One street before the victim's street, Deandra, Gains, and the appellant got out of the cars. Gains covered his license plate and got back into his car. The appellant and Deandra were standing in front of Gains's car, and Lance heard "bits and pieces" of their conversation. He said he heard the appellant tell Deandra that Deandra had to kill the victim. Deandra said okay, and the men returned to their respective cars. Davis, Deandra, and Gains left first in the green Thunderbird and made a left turn. The appellant, Lance, and Hendricks were in a gray Caprice, and they made a right turn to take Hendricks home. While they were near the victim's house, Lance heard three gunshots, screeching tires, and two more gunshots. Lance was surprised to hear the gunshots because he did not think the appellant and Deandra had actually intended to kill the victim. Lance telephoned Gains to find out what was happening, but no one answered. Ten or fifteen minutes later, Hendricks called the men in the other car and arranged to meet them by a school. After everyone arrived, Deandra said that he had shot the victim. The appellant gave Lance and Gains some marijuana, and Deandra and the appellant split a small amount of money.

Lance testified that a few days after the shooting, he, Gains, Davis, and the appellant were at Davis's house. Lance's mother called and said that detectives were there to talk to him. The appellant "told [Lance] not to say nothing." Lance walked home and spoke with the detectives. Lance feared for his family's safety, so he lied to the detectives, claiming that he did not know anything about the robbery and murder. After his arrest, he told the police the truth.

On cross-examination, Lance testified that by the time the men stopped a block from the victim's house, "there had already been a plan that [the victim] was going to get robbed." He acknowledged that when he spoke with the police before his arrest, he omitted his knowing about the robbery and murder. After his arrest, he disclosed everything he knew about the crimes. He acknowledged that he testified on behalf of the State in a different case and that he received probation in exchange for his testimony. He said he hoped to receive consideration from the State for his testimony in this case but would have testified anyway.

Metro Detective Curtis Hafley testified that he was the lead investigator for this case and arrived at the scene after 1:00 a.m. on September 30, 2007. He interviewed various witnesses. No one knew the name of the shooter, but some of the witnesses described a dark-colored car that was either a Ford Thunderbird or a Mercury Cougar. Haines told Detective Hafley that the victim had received telephone calls immediately before the shooting, including a call from the appellant. Additionally, Haines said that the appellant previously had come to the victim's residence in a dark-colored Thunderbird.

Detective Hafley testified that in the early afternoon hours of September 30, he went

-8-

to the appellant's home and interviewed him. Detective Hafley audio-recorded the interview. During the interview, the appellant said that the previous night, he went to a party in Mt. Juliet, went to McDonald's, and eventually proceeded to Club Faded. The appellant said he had been with Davis, Deandra, Lance, Gains, and Hendricks. The men traveled in two cars, Deandra's gray Chevrolet Caprice and Gains's green Ford Thunderbird. The appellant said that Michael Smith had owed the victim forty-five dollars and that Michael had "mentioned something about robbing [the victim], but [the appellant] thought that Michael Smith was to[o] much of a weakling to do that."

Detective Hafley testified that he learned that Michael owned "a dark-colored gray, silver Ford Thunderbird." Detective Hafley went to Michael's home and saw the Thunderbird parked behind the house. Michael denied any involvement in the shooting, and the police confirmed his alibi. The police searched Michael's car but found no evidence connecting it to the crimes.

Detective Hafley testified that he retrieved the telephone records of the appellant and his co-defendants, which revealed that the first call to the victim on the night of the shooting originated from Gains's cellular telephone. The next call, during which Haines recognized the appellant's voice, came from Deandra's telephone. Detective Hafley said that he spoke with Haines, Coleman, Lance, and Deandra. He also spoke with Felix Ridley, Jr., who was known as "Hootie" and who was related to Davis. Detective Hafley interviewed Gains at the police department and learned that the victim's cellular telephone had been discarded in a park on Oakwood. Police later found the telephone in the area Gains had described.

On cross-examination, Detective Hafley testified that the police were unable to match the bullets recovered from the victim's body to a particular gun. He stated that, initially, Gains was reluctant to discuss the crimes and hesitant to talk about the appellant.

Detective Hafley testified that the appellant conceded that he went to McDonald's with his co-defendants on the night of the shooting but never admitted to any involvement in the crimes. Detective Hafley acknowledged that Deandra had been incarcerated for a previous conviction of especially aggravated robbery.

Dr. Amy R. McMaster, the Chief Medical Examiner for Davidson County, testified that she performed the victim's autopsy. The victim received four gunshot wounds. One of the wounds was to the victim's right hand and was not life-threatening. The other three wounds were to the torso and were potentially fatal. The victim's blood tested positive for "THC," the active ingredient in marijuana.

Agent Michael Frizzell of the Tennessee Bureau of Investigation (TBI) Technical

Services Unit testified that Detective Hafley gave him Deandra's cellular telephone records for the night of the shooting and requested an analysis. The records revealed that at 12:55 a.m. on September 30, 2007, a call was placed from Deandra's cellular telephone to the victim's telephone. The call was relayed through a cellular antenna located at 3217 Dickerson Pike, indicating that Deandra was close to the victim's residence when the call was placed. Agent Frizzell cautioned, however, that "you cannot pinpoint someone's location based on what cell phone tower their cell phone might hit off of."

Asica Featherston, Lance's Featherston's older sister, testified for the appellant that she and the appellant were dating at the time of the shooting. Asica arrived at her residence before midnight on September 29, 2007. Lance's "baby-mama" was with her. At the time of their arrival, Lance, Gains, Deandra, Davis, Hendricks, and the appellant were standing outside the residence, "hanging out." Asica spoke with the appellant, and he told her they were going to buy marijuana.

Beth Halstead testified that she was an employee of the Davidson County Criminal Court Clerk's Office. She said Deandra had prior convictions of especially aggravated robbery and aggravated robbery.

The jury convicted the appellant as charged of first degree felony murder and especially aggravated robbery, a Class A felony. The trial court imposed concurrent sentences of life and eighteen years, respectively. Thereafter, the appellant filed a motion for a new trial, a motion for a judgment of acquittal, and a petition for a writ of error coram nobis. The trial court denied the motions and the petition.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to show that he was criminally responsible for Deandra's killing the victim. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v.

Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is defined as robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

The proof shows that Deandra took property from the victim and shot him. In Tennessee, "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Id. at 171. The appellant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or

-11-

attempts to aid another person to commit the offense." Specifically, when the appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997).

In the instant case, the State's proof established that the appellant telephoned the victim and arranged to buy marijuana from him. On the way to the victim's residence, the appellant told Deandra to rob and kill the victim. When Deandra met the victim, he pointed a gun at the victim and ordered the victim to give him everything in the victim's pockets. The victim complied, and Deandra shot him multiple times. Although the victim had the money from the sale of a motorcycle in his pocket before the shooting, the money was not there after the shooting. Following the shooting, Deandra, the appellant, and their friends met at a playground. Deandra shared the marijuana with Gains and Lance, and Deandra and the appellant divided some money. The evidence is sufficient to support the appellant's felony murder conviction based upon a theory of criminal responsibility.

## B. Right to Compel Process

The appellant contends that the trial court violated his right to compel the production of a favorable witness by refusing to allow him to call a co-defendant, William Davis, after Davis expressed his intention to exercise his Fifth Amendment right against self-incrimination. In a related argument, the appellant contends that he should have been allowed to question Davis regarding "non-incriminating" information and that the trial court's refusal prevented him from presenting a defense. The State argues that the trial court did not abuse its discretion by refusing to compel Davis to testify and that the appellant failed to specify the non-incriminating questions he wanted to ask or what answers Davis would have given. We conclude that the appellant is not entitled to relief.

In a jury-out hearing during the appellant's proof, defense counsel called Davis to the stand, and Davis said he was represented by counsel. Defense counsel asked if Davis was with the appellant on the night the victim was killed. Davis stated, "Plead the Fifth." Counsel told Davis that the previous question was "before any kind of incident involving Mr. Sanders, this is earlier in the evening." The record reflects that Davis conferred with his attorney and that Davis stated, "I would just like to invoke my Fifth Amendment rights." Counsel asked Davis if he remembered speaking with Detective Hafley about this case, and Davis again answered, "Fifth." At that point, defense counsel asked the trial court to instruct Davis that the Fifth Amendment "does not protect him just from blanket not answering questions that do not have any criminal implications." The trial court responded that Davis could invoke his Fifth Amendment right at any time.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Under the Sixth Amendment to the United States Constitution, which is applicable to the states via the Fourteenth Amendment, an accused has the right to compulsory process in order to obtain witnesses favorable for the defense. State v. Hester, 324 S.W.3d 1, 93-94 (Tenn. 2010) (appendix) (citing Faretta v. California, 422 U.S. 806, 816 (1975)). Similarly, the Tennessee Constitution affords a defendant facing criminal prosecution the right "to have compulsory process for obtaining witnesses in his favor." Tenn. Const. art. I, § 9. Regardless, a criminal defendant's right to compulsory process is not without limits; instead, "'the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.'" State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982) (quoting Bacon v. State, 385 S.W.2d 107, 109 (Tenn. 1964)).

Our supreme court has cautioned, however, that "[t]he calling of a witness who will refuse to testify does not fill the purpose of compulsory process, which is to produce testimony for the defendant." State v. Dicks, 615 S.W.2d 126, 129 (Tenn. 1981). Moreover, "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, . . . the right against self-incrimination is the stronger and paramount right." Id. The court has further stated that

> "[i]f it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has a right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him.

Id. (quoting United States v. Johnson, 488 F.2d 1206, 1211 (1st Cir. 1973)). The trial court has the discretionary authority to determine "whether a witness has properly invoked his fifth amendment right against self-incrimination." State v. Zirkle, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). This court will reverse the trial court's decision only upon a plain abuse of that authority. Id.

Turning to the instant case, the proof against the appellant suggested that Davis was a willing and active participant in the crimes. Moreover, during the jury-out hearing, defense counsel attempted to question Davis about the exact crimes for which he had been indicted but not yet tried. Therefore, "[i]nferentially almost anything [Davis] said was potentially

-13-

incriminating." Id. at 890-91. This court has previously stated that in order for the invocation of the Fifth Amendment right to be proper, "'it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question . . . might be dangerous because injurious disclosure could result.'" State v. Burns, 777 S.W.2d 355, 359 (Tenn. Crim. App. 1989) (emphasis in original) (quoting Hoffman v. United States, 341 U.S. 479, 486-87 (1951)).

The appellant, citing State v. Dooley, contends that the trial court should have determined on a "'question by question'" basis whether the information he was attempting to elicit from Davis was incriminating. See Dooley, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000). However, Dooley involved a witness, not a co-defendant, who asserted his Fifth Amendment right regarding unrelated charges. 29 S.W.3d at 550. Additionally, as noted by the State, the appellant has not specified what "relevant non-incriminating information" he would have, or could have, elicited from Davis. Therefore, we conclude that the trial court did not abuse its discretion by refusing to compel Davis to testify.

### C. Prior Statement as Substantive Evidence

The appellant contends that the trial court erred by not allowing him to introduce Gains's audio-recorded statement to Detective Hafley as substantive evidence pursuant to Tennessee Rule of Evidence 803(26), the exception to the hearsay rule for the prior inconsistent statement of a testifying witness. The State contends that the trial court properly refused to admit the statement as substantive evidence. We agree with the State.

On direct examination, Gains testified that he suggested that he and his friends smoke marijuana before going to the club and that the appellant stated he could get marijuana from the victim. Gains said that shortly thereafter, he heard the appellant tell Deandra to rob the victim. Gains said that in his initial statement to Detective Hafley, he failed to disclose what happened at the victim's house.

Before cross-examination, defense counsel requested a jury-out hearing regarding the admissibility of Gains's initial statement as substantive evidence pursuant to Tennessee Rule of Evidence 803(26). The State objected, and the trial court allowed defense counsel to question Gains as follows:

> Q. The very first time that you spoke with Detective Hafley was, also, on October 9th of 2007. And, then, you talked to him, again, on October the 9th of 2007. And, then, you talked to him, again, on the tenth. Is that right? At the station.

A. Right.

Q. The first time is what I'm referring to. Okay? And you said you were at your home and you were alone; is that right?

A. Right.

Q. And they asked you questions regarding what had gone on with this entire incident?

A. Right.

Q. You told him much of what we've heard on your direct testimony about going to Mt. Juliet, and going to the McDonald's, and being with Mr. Cunningham, and Mr. Davis, and [Deandra], and Mr. Featherston, and Hendricks.

A. Right.

Q. Also you talked to him about having gone to the club at a later time in that evening, and -- with various people -- and, then, ended up in Kentucky for the night; is that right.

A. Right.

Q. And all of those things you talked to the detective about when he came to your house that first time?

A. Right.

Q. And you said, when the General asked you, you know, was the statement you gave him true, and you said "Yes, it was true;" right?

A. Right.

Q. And you said that you'd just left some of the parts out regarding what had happened with the sale of the marijuana, or the robbery, or the shooting, or whatever that may have happened. The rest of the statement you made was true?

A.  Right.

Defense counsel argued that a portion of the statement was admissible as substantive evidence.  Specifically, defense counsel requested admission

> where Mr. Gains said that he didn't find [out] about anything until the following morning.  There are other place[s], interspersed where he denies knowing who was involved in this, denying knowing Mr. Sanders had been shot. . . . But, the substance of it is that he denied having any knowledge.  He said he would have told had [he] known and things of that nature.

The State responded that defense counsel had failed to establish that Gains denied making the statement.  Thereupon, defense counsel examined Gains as follows:

> Q.  You mentioned briefly on your direct testimony that [Deandra] had communicated to you, that you were to mislead or deceive the police, or, at least, omit any discussion with the police about what had gone on at Mr. Sanders' house.  Is that right?
>
> A.  Right.
>
> Q.  And during the conversation that you had with Detective Hafley and Detective Brown at your house you did not lie, you just omitted things.  Is that right?
>
> A.  I omitted the part about [the victim's] house.
>
> . . . .
>
> Q.  You're saying the statement that you gave him was true?
>
> A.  Everything except me not letting them know about the incident.
>
> . . . .
>
> Q.  So, when you denied having knowledge of who the shooter might have been, that is what you're saying was dishonest or

untruthful?

A. Right.

The trial court found that in order to be admitted as substantive evidence, "the prior inconsistent statement has to have trustworthiness. And that's the part that I don't see it having the circumstances indicating trustworthiness; and, he has admitted that he didn't tell them the truth about it." Defense counsel asked the court to state on the record its reasons for finding the statement lacked trustworthiness. The court responded, "Well, his statements themselves." The court ruled that defense counsel could cross-examine Gains about the statement but could not introduce it as substantive evidence.

On appeal, the appellant contends that because Gains "equivocated about the contents of the statement and the truthfulness of the statement, it was proper for the trial court to admit the statement as substantive evidence pursuant to Rule 803(26)." In response, the State maintains that Gains acknowledged making the statement, that the statement was not inconsistent with his trial testimony, and that he explained any deviations between his statement and his testimony; therefore, the trial court properly ruled that the statement was inadmissible. We agree with the State.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is typically not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay.[2] See Tenn. R. Evid. 802.

Tennessee Rules of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement. The statement is admissible as substantive evidence if the following conditions are satisfied:

1. The statement must be admissible under Tennessee Rule of Evidence 613(b).

---

[2]We note the disagreement regarding the appropriate standard of review for the admissibility of hearsay evidence. Compare Pylant v. State, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008)), and State v. Jimmy Martin, No. W2013-00889-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 526, at *49 (Jackson, June 5, 2014) (all stating that the standard of review is abuse of discretion), with State v. Gilley, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard), perm. to appeal denied, (Tenn. 2009). However, for purposes of our review, the evidence was inadmissible under either standard.

2. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.

3. The statement must be audio or video recorded, written and signed by the witness, or given under oath.

4. The trial court must conduct a jury-out hearing to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) and Advisory Comm'n Cmts. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

Our supreme court has explained that, regarding the admissibility of a statement under Tennessee Rule of Evidence 613(b), "[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." State v. Martin, 864 S.W.2d 564, 567 (Tenn. 1998). Moreover, this court has stated that "[e]xtrinsic evidence is not admissible until (1) the witness is asked whether the witness made the prior inconsistent statement; and (2) the witness denies or equivocates as to having made the prior inconsistent statement see State v. Markreo Quintez Springer, No. M2012-02046-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 572, at *30 (Nashville, June 20, 2014), perm. to appeal denied, (Tenn. 2014).

In the instant case, Gains acknowledged that during his initial statement to Detective Hafley, he made inconsistent statements, explaining that under the direction of the appellant, he did not reveal his or his co-defendants' trip to the victim's house on the night of the shooting. Defense counsel did not ask Gains about any specific statement he made to Detective Hafley in which Gains denied or equivocated making the statement. "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998); see also Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[5][a] (LEXIS publishing, 6th ed. 2011). This is because "[t]he unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness[] during trial. Extrinsic evidence of a prior consistent statement is generally inadmissible and not subject to Rule 613(b)." Martin, 964 S.W.2d at 567; see also State v. Ackerman, 397 S.W.3d 617, 639 (Tenn. Crim. App. 2012). Therefore, under

Rule 613(b), extrinsic evidence of the prior inconsistent statements was inadmissible. See State v. Wyrick, 62 S.W.3d 751, 788 (Tenn. Crim. App. 2001); see also State v. Tommy Dale Adams, No. M2013-01080-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 714, at *50 (Nashville, July 21, 2014) ("If the witness admits making the prior inconsistent statement, any extrinsic proof of the statement would be cumulative and therefore inadmissible."), application for perm. to appeal filed, (Tenn., Sept. 22, 2014). Thus, the trial court did not err by refusing the admit Gains's statements as substantive evidence.

Regarding the trial court's finding that the auido-recorded statement lacked trustworthiness, the appellant contends that the trial court erred because the court based its ruling on the trustworthiness of the statement itself rather than the circumstances under which Gains gave the statement. The appellant also contends that the circumstances in this case indicate trustworthiness because Gains gave the statement in his home, while he was not under arrest, and after he had received Miranda warnings.

Initially, we note that the trial court specifically stated that "the prior inconsistent statement has to have trustworthiness. And that's the part that I don't see it having the circumstances indicating trustworthiness." (Emphasis added.) In any event, in our view, the fact that Gains gave the statement at home, as opposed to in a formal setting such as the police department, is not necessarily a circumstance that supports trustworthiness. Moreover, Gains gave the statement nine days after the incident, well after the excitement of the event was over. See State v. Reba Nell Woods, No. M2012-01922-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 1086, at *79-80 (Nashville, Dec. 9, 2013) (noting that the fact that a statement qualified as an excited utterance under the excited utterance exception to the hearsay rule supported the statement's trustworthiness for purposes of Rule 803(26) analysis). Finally, Gains gave the statement based on the story that Deandra Smith had made up and that everyone in the group had agreed to repeat if the police "ever came questioning." Therefore, Gains did not give his audio-recorded statement under circumstances indicating trustworthiness, and the trial court did not err by ruling that the statement was inadmissible as substantive evidence.

D. Cross-Examination Regarding the Appellant's Additional Statements

Next, the appellant contends that the trial court erred by limiting his cross-examination of Detective Hafley about additional statements made by the appellant after the State introduced one of his statements into evidence. The State argues that the trial court did not err. We agree with the State.

At trial, the State announced its intention to introduce into evidence only one of the

statements the appellant made to the police.[3]  The State requested that the trial court instruct the defense that it could not question Detective Hafley about the appellant's other interviews. Defense counsel argued that he should be allowed to question Detective Hafley about the appellant's offers to assist with the State's investigation.  Defense counsel said, "I don't see why that should [be] excluded because the State hadn't solicited that information from the detective.  It's certainly favorable information to [the appellant]."  The trial court ruled that the statements were self-serving and, therefore, inadmissible.

On appeal, the appellant contends that the trial court erred by refusing to allow him to cross-examine Detective Hafley about the appellant's stating that he was willing to make controlled telephone calls to Deandra and wear a body wire to assist with the investigation. The State responds that the statements were self-serving pursuant to Hall v. State, 552 S.W.2d 417 (Tenn. Crim. App. 1977), and were inadmissible because the offers of assistance were made in statements not introduced by the State.  The appellant argues that the State's reliance on Hall is misplaced.

In Hall, the defendant was charged with two thefts.   Id. at 417.  After his arrest, he gave an exculpatory statement, which included an alibi.  Id.  At trial, the defendant did not testify but relied upon an alibi defense.  Id.  On appeal, the defendant argued that the trial court erred by overruling his motion to require the State to introduce his exculpatory statement.  Id.  This court ruled that the State was not obligated to present the statement.  Id. at 417-18.  Moreover, this court stated that the defendant could have testified about his alibi and been subject to cross-examination; however, he could not have introduced the self-serving statement.  Id. at 418.  This court explained:

> A declaration made by a defendant in his own favor, unless part of the res gestae or of a confession offered by the prosecution, is not admissible for the defense.  A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness.  If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

Id. (Internal quotations and citation omitted).

The appellant claims that Hall "does not restrict the ability of the defense to inquire on cross-examination about the existence of a statement that may have been collected as part

_____

[3]The State advised the trial court that the statement at issue was "one of about six on that CD."

-20-

of the investigation, it merely restricts inquiry into its contents." However, the appellant sought to introduce the contents of the statement, namely his offer to cooperate with the authorities after his arrest. Any of the appellant's statements to Detective Hafley would have been hearsay and therefore inadmissible without qualifying as a hearsay exception. See Tenn. R. Evid. 801(c), 802. The appellant has suggested none.

Additionally, only relevant evidence is admissible. Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). We fail to see, and the appellant has failed to explain, how his offers of cooperation to the authorities made his guilt more or less probable. Accordingly, we conclude that the trial court did not err by ruling that the evidence was inadmissible.

### E. Discovery Violation

The appellant contends that the trial court erred by allowing the State to introduce his co-defendants' cellular telephone records into evidence when the State did not provide the records to the defense until the third day of trial. In response, the State argues that the appellant failed to request a continuance and that any error was harmless. We conclude that the appellant is not entitled to relief.

Before trial, the appellant filed a motion for discovery pursuant to Rule 16, Tennessee Rules of Criminal Procedure. During Detective Hafley's testimony on May 9, 2012, the State began to question him about the cellular telephone calls made by the defendants on the night of the crimes. Defense counsel objected and requested a bench conference. In the conference, he stated as follows:

> Judge, the detective has begun to testify about information that has come through the judicial subpoena, I guess, through Cricket. I don't know if all the phone records are from Cricket or not. But there's been no foundation laid about these records. He's just offering conclusionary information to the jury with nothing to support it, but he's offering it as if it's fact.

The State responded that it would "just go ahead and introduce[] all the cell phone records, and that way we can let it go from there." Defense counsel argued that the State would have to authenticate the records first, and the trial court agreed. The State said that it possessed the authentications and would search through its materials to find them. Defense counsel noted that "[t]here were numerous numbers involved from various phones, various other

phones. Probably, at least, four or five phones." At the conclusion of the conference, the court dismissed the jury for the day.

The next morning, Detective Hafley's direct testimony resumed, and he testified that in the course of his investigation, he learned that Deandra had two cellular telephones. Detective Hafley said he obtained the numbers for those phones and a judicial subpoena for Deandra's cellular telephone records. Defense counsel again requested a bench conference.

During the conference, the State advised the trial court that it had the authentications for the records and that it wanted to introduce the records into evidence through Detective Hafley. Defense counsel objected, arguing that the State had not provided him with the authentications in discovery and that he still had not seen the authentications. The State handed the documents to defense counsel. After a pause, defense counsel advised the trial court that the State had just provided him with two letters dated May 9, 2012, "which leads me to believe that . . . they've gotten these, literally, at the last minute. . . . [T]hey've apparently just been authenticated in the last twelve hours." The State advised the court that, due to the many continuations in the case, it could not find the "original authentication" in the record. Accordingly, the State had obtained the new authentications the previous day. The State maintained that the defense had "absolutely known since day one . . . that the State intended to introduce these records at trial," explaining that the name and telephone number of the person who prepared the cellular telephone records had been included in the discovery materials. Defense counsel replied:

> I find it hard to believe that in several hundred pages of phone
> records the affidavit, or whatever the General is referring to, is
> the one portion that is left out. I do not have that in discovery.
> I have had the phone numbers, and tower numbers, and things
> of that nature for a long time. . . . It is not my job to authenticate
> evidence for the State.

The trial court stated that although the State had just provided the authentications to the appellant, "I don't know that it necessarily disqualifies them." The State introduced two sets of Cricket records and two letters from Cricket authenticating the records into evidence as exhibits 9A and 9B during Detective Hafley's direct testimony.

The record reflects that before defense counsel was able to finish his cross-examination of Detective Hafley, the witness had to go out of town. By the time he returned to court, the State had already concluded its case-in-chief. Defense counsel resumed its cross-examination and, during a break, advised the trial court that the State had shown him "a copy of a disk and an affidavit from Cricket Communications that, I believe, she obtained

yesterday; and, told me that she intended to introduce that." Defense counsel said he told the State that "at this point the [proof] is closed" and that "she cannot introduce new evidence on redirect." The State replied, "There was direct testimony regarding the phone records, and cross yesterday regarding the phone records. Therefore on redirect the remaining phone records can come in. . . . [A]ll I am going to do is just introduce the records." The trial court stated, "Well, I am not so sure it can come in, but I don't think it is going to make any difference so I'll let [the State] do that." During Detective Hafley's redirect examination, the State introduced the Cricket Communication records for numerous cellular telephones and a May 9, 2012 letter from Cricket authenticating the records into evidence as exhibit 13. The State also elicited the following testimony from the detective:

> [The records] reflected that Mr. Gains' phone was used to call the victim two times, within -- I believe once was at twelve-fifty-three a.m. and then again . . . between twelve-fifty-three and twelve-fifty-seven. . . . Another one, twelve-fifty-four. And another one right again at twelve-fifty-six and twelve-fifty-seven. So, two calls within a four-minute span, both of which were eleven -- the first call was eleven minutes before the first 911 call came in about the shooting.

Tennessee Rule of Criminal Procedure 16 governs the discovery rights of parties in criminal proceedings. In pertinent part, Rule 16(a)(1)(F) provides that

> [u]pon a defendant's request, the state shall permit the defendant to inspect and copy or photograph . . . documents . . . or copies thereof, if the item is within the state's possession or control and:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or
>
> (iii) the item was obtained from or belongs to the defendant.

On appeal, the appellant contends that "Mr. Cunningham and his counsel were provided, on the morning of the third day of trial, cell phone records that the State obtained during the week of trial." He claims that the trial court erred by allowing the State to introduce the Cricket records when the State violated Rule 16 and that the error "prejudiced

-23-

Mr. Cunningham as it allowed the admission of evidence that was to be considered by the jury after the close of their proof." The State argues that even if the records were a surprise, the appellant failed to request a continuance and that any error was harmless.

Rule 16 does not explicitly mandate the sanction a court should impose on the State after failure to comply with a discovery order; instead, the rule provides that the court may enter such sanction "'as it deems just under the circumstances.'" State v. Collins, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000) (quoting Tenn. R. Crim. P. 16(d)(2)). A trial court has great discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction imposed should fit the circumstances of the case, Collins, 35 S.W.3d at 585, but suppression of evidence upon a Rule 16 violation is a drastic remedy reserved for the most flagrant of violations, see State v. House, 743 S.W.2d 141, 146 (Tenn. 1987).

Regarding the Rule 16 violation, the appellant bears the burden of demonstrating "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992). As noted by the State, the appellant did not request a continuance, which was a possible remedy, in order to investigate the records. See Tenn. R. App, P. 36(a). In addition, defense counsel was obviously well aware of the Cricket records before trial, mentioning them during the first bench conference. We note that the appellant did not contend at trial and does not argue on appeal that the records were inaccurate. Therefore, we conclude that the trial court did not abuse its discretion by allowing the State to introduce the Cricket records into evidence.

Regarding the appellant's claim that the trial court should not have allowed the State to introduce evidence after the close of its proof, the circumstances in this case were unique in that, due to reasons apparently beyond either party's control, the appellant could not finish cross-examination of Detective Hafley until after the State had closed its case-in-chief. "'In the absence of an injustice, a trial court's decision to permit the introduction of further evidence after a party has rested must be upheld.'" State v. Chris L. Young, No. M2008-01255-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 748, at *8 (Nashville, Sept. 9, 2009) (quoting State v. Anthony Paul Alderson, No. 01C01-9611-CC-00461, 1997 Tenn. Crim. App. LEXIS 1174, at *7 (Nashville, Nov. 21, 1997)); see Clariday v. State, 552 S.W.2d 759, 770-71 (Tenn. Crim. App. 1976); Reba Nell Woods, No. M2012-01922-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 1086, at *75. "'In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of granting of the motion.'" Id. (quoting United States v. Thetford, 676 F.2d 170, 182 (5th Cir. 1982)). Considering these factors, particularly the importance of the records to the State's case, we conclude that the trial court did not abuse its discretion by allowing the State to introduce the records during Detective Hafley's redirect-examination testimony.

## F. Writ of Error Coram Nobis

Finally, the appellant contends that the trial court erred by denying his petition for a writ of error coram nobis. After trial and sentencing, the appellant filed the petition, alleging that Gains and Lance had admitted that they falsified their trial testimony. During an evidentiary hearing, Michael Richard Miller testified that he was incarcerated and had pending criminal charges. In 2009, Miller was incarcerated on a misdemeanor charge in Hill Detention Center. Miller and Gaines were both housed in "HD-2." The men did not share a cell, but they saw each other daily and played cards together. Miller said that during their conversations, Gains told Miller "that he was arrested for murder and that [the State] really didn't want him that they wanted somebody else, and it really wasn't snitching if he just lied and said anything he had to say to get out of jail." Gains also told Miller that "he would, pretty much, just say whatever he had to say to get his probation to get out of jail, it didn't really matter if he had to lie, or whatever." Gains never identified the person against whom he intended to testify.

Miller testified that after he spent two weeks in HD-2, he was transferred to "G pod." There, he met Lance, who slept in the bunk beneath Miller. Miller told Lance that he had come from HD-2, and Lance asked if Miller knew his cousin, Gains. Miller said yes. Lance told Miller that he and Gains had a plan to get out of jail and that he "was going to back up whatever [Gains] said." Lance did not provide any additional details and did not name the person against whom they would testify.

Miller testified that in May 2012, he moved into the pod in which the appellant was housed and that he and the appellant discussed their "situations." The appellant mentioned that he had several co-defendants and that Miller might know some of them. After the appellant named his co-defendants, Miller said that he had been incarcerated with two of them. He told the appellant what Gains and Lance had said about falsifying testimony. The appellant told Miller that the two men had lied when they testified against him. Miller replied, "'Wow, you know, that makes a lot of sense, because that's what they were talking about doing three years ago, you know, and I wonder if that's you.'"

On cross-examination, Miller testified that "snitching" was not necessarily a negative thing, explaining, "People tell so that they can get better deals, and go home. So, if that helps them out on their case I don't see how it's bad . . . ." Miller said that Gains did not go into the details of the case because most attorneys "advise[] their client[s] not to do that in jail." Gains told Miller only that he was charged with murder and robbery, that he was not a "snitch," and that "[h]e would do whatever it took to get out of jail."

-25-

Rontaraus Roberson testified that he was incarcerated for facilitation of first degree murder. In May 2012, before the appellant's trial, Roberson was "on the fifth floor in 5-C pod" with Gains. Roberson thought their cases were similar, so he asked Gains questions. Gains told Roberson "about [the appellant], about the case that was going on, and what he was . . . going to do, saying that he was lying on [the appellant] about his parts in a murder case." Gains said that he had a deal with the State that he would "get a time cut" if he testified against the appellant. Gains also stated that the appellant "wasn't even on the scene when the murder happened." Roberson said that after the appellant's trial, he spoke with Gains again. Gains said that he and Lance had testified against the appellant.

On cross-examination, Roberson acknowledged that he was a former "Blood" gang member. He stated that the appellant was a "Piru" gang member, not a Blood. Roberson acknowledged that "snitches aren't looked on very highly in jail." Roberson said that Gains "was just telling me that he wasn't the killer, he was just the driver."

After the hearing, the trial court issued an order denying the petition. The court stated that the appellant had failed to adduce new evidence which would have resulted in a different judgment. The court said that the appellant

> had ample opportunity to cross examine the witnesses regarding their involvement and knowledge of the circumstances surrounding this case. In fact, both [Gains] and [Lance] were cross examined regarding the possibility of favorable consideration in exchange for their testimony. At trial, other witnesses and evidence corroborated the testimony of [Gains] and [Lance]. Furthermore, the Court does not find the testimony of the [appellant's] witnesses at the coram nobis hearing to be credible.

The appellant challenges the denial of his petition for a writ of error coram nobis. The writ of error coram nobis, which originated in common law five centuries ago, "'allowed a trial court to reopen and correct its judgment upon discovery of a substantial factual error not appearing in the record which, if known at the time of judgment, would have prevented the judgment from being pronounced.'" State v. Wlodarz, 361 S.W.3d 490, 496-97 (Tenn. 2012) (quoting State v. Mixon, 983 S.W.2d 661, 666-67 (Tenn. 1999)). The writ, as first codified in Tennessee in 1858, was applicable to civil cases. Id. at 498. In 1955, a statutory version of the writ of error coram nobis was enacted, making the writ also applicable to criminal proceedings. Id. In general, the writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." Mixon, 983 S.W.2d at 672.

Currently, the writ is codified in Tennessee Code Annotated section 40-26-105:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis must be filed within one year after the judgment becomes final in the trial court. Tenn. Code Ann. §27-7-103. The instant petition meets this requirement. Our supreme court outlined the following procedure to utilize in assessing the merits of a petition for a writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Id. (Internal quotation and citation omitted).

Initially, we note that the trial court found that "the proof and argument presented at the hearing do not provide any new evidence that a different judgment would have resulted." (Emphasis added). The proper standard to be applied, however, is whether the jury "may have" reached a different result. This court has previously stated, "While this appears at first glance to be a matter of mere semantics, the difference in the analysis of the situation under a 'would have' standard is definitively more burdensome for a coram nobis petitioner than would be the case under a 'may have' standard." Margo Freshwater v. State, No.

W2006-01758-CCA-OT-CO, 2008 Tenn. Crim. App. LEXIS 803, at *9 (Tenn. Crim. App. at Jackson, Oct. 8, 2008); but see Billy Ray Irick v. State, No. E2010-02385-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 367, at *15 n.5 (Knoxville, May 23, 2011) (stating that despite the trial court's ruling not being "expressed in the proper 'might have' standard" announced in Vasquez, the court's "formulation [did] not evince an application of the wrong standard"). We conclude that the trial court applied the incorrect standard in denying coram nobis relief. See Johnson v. State, 370 S.W.3d 694, 698-99 (Tenn. 2011); Vasques, 221 S.W.3d at 527-28.

Nevertheless, the trial court found that Gains's and Featherston's testimony was corroborated by other evidence at trial and that they were cross-examined about whether they were offered favorable consideration for testifying. The trial court also found that Miller and Roberson were not credible. This court has noted that assessing the credibility of witnesses is within the sound discretion of the trial court. Johnson, 370 S.W.3d at 700. Accordingly, we conclude that the trial court did not abuse its discretion by denying the petition.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-28-